ELMER E. SIEGEL v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a Corporation, Appellant.—119 S. W. (2d) 376.

Division Two, August 17, 1938.

*Carl S. Hoffman* and *Everett Paul Griffin* for appellant.

*N. Murry Edwards* and *Robert A. Harris* for respondent.

BOHLING, C.—Elmer E. Siegel seeks a judgment of $95,000 for personal injuries against the Missouri-Kansas-Texas Railroad Company, a corporation, under the Federal Employers' Liability Act (45 U. S. C. A., Chap. 2) for violation of the Federal Safety Appliance Act (45 U. S. C. A., Chap. 1) and common-law negligence. Defendant prosecutes this appeal from an order granting plaintiff a new trial on assigned grounds of error in defendant's instructions. The first question for determination is whether or not plaintiff was engaged in interstate commerce at the time of his injuries. We may assume defendant's negligence for our discussion of the issue.

On the disputed fact issues, plaintiff's was the only testimony undertaking to establish interstate transportation at the time he received his injuries; and due to the omission of certain factual elements therefrom and inconsistencies and contradictions therein a more detailed statement is called for than would otherwise be necessary.

Plaintiff, head brakeman on defendant's local freight train, transporting inter and intrastate traffic, from Franklin to Lindale, Missouri, an intrastate journey, was injured on the morning of October 9, 1933, while engaged in a switching movement at Clinton, Missouri. The train crew performed all the necessary switching, including local switching, at stations not having a switch engine, Clinton being such a station. The depot at Clinton faces east, having a concrete and brick station platform. Defendant's main track, a north and south track, is adjacent to the station platform. East of the main track

is a passing track which connects with the main track at points north and south of the depot. An industry track, known as the poultry or elevator track, extends south and east from a point north of the depot on the passing track and, in turn, services a poultry establishment, a farmer's elevator and some oil stations. The house track extends west and north from a point on the main track south of the depot and services the freight platform on the west side of the depot and industries north of the depot. Extending west from this house track are tracks known as the team track and repair or rip track. Extending west and south from a point on the main track south of the depot is the stock track, which services the stockyards, approximately a quarter mile south of the station. North of the depot, from a half to a mile, is located the Frisco exchange track, a track on which cars are interchanged by the defendant and Frisco railroad; and also an industry track extending east from the main track to what is known as the Larabee Mill. Defendant's train on the day in question, proceeded south from Lewis, the first station to the north, on a continuous run until it headed in on the passing track at Clinton. The switch list for defendant's said train at Clinton on the day in question was offered in evidence by plaintiff and disclosed, in so far as here involved, the following situation upon the train's arrival. On the house track, the following cars: an empty Frisco car, destined for the Frisco interchange track, a car of fertilizer, destined for the farmer's elevator, and three empty stock cars, destined for the chute at the stock yards. On the Larabee track, several cars of flour destined for different points, including defendant's car No. 95661, destined for Fort Worth, Texas. On the farmer's elevator track, an empty New York Central car, destined for St. Louis. On the rip track an empty box car. On the team track, an empty box car. The two latter cars were destined to the Larabee Mill, which wanted ten flour cars but had eight on the mill switch.

Plaintiff, when asked on cross-examination to tell about the switching movements, having reference to movements prior to his injury, testified he could not tell very much about that, and that he did not know and did not remember whether or not they had been to the Larabee Mill.

On direct examination plaintiff was asked concerning the switching movement they were making at the time he was injured. He testified they were switching out the Frisco car to make Frisco delivery; that the train was on the house track; that the Frisco car was then on the main track, a little north of the depot; that north of the Frisco car was the engine, headed south, with five cars coupled to and north of it, and they were attempting to couple the Frisco car to the front of the engine; that the five cars consisted of the three stock cars to be placed at the stock chutes coupled to the engine and the New

York Central box car and the car load of flour for Fort Worth, Texas, north of the stock cars, but on cross-examination he testified the three empty stock cars were on the end of the string of cars behind the engine. Swing brakeman Bohon was in charge of the movement. The coupling failed to make, and the Frisco car started rolling. Plaintiff mounted the Frisco car, set the brake and was on the ladder of the Frisco car when the engine again struck the car in another effort to make the coupling, causing plaintiff to fall from the car to the station platform. Plaintiff testified he was rendered unconscious by this fall and did not know anything until November 3, 1933.

On cross-examination plaintiff testified that defendant had no switch engine at Clinton; that the regular engine became the switch engine for switching purposes; that they were coupling up with the Frisco car because they were on their way to spot the three empty stock cars on the end of the cut of cars at the stock chutes; and, after leaving the empty stock cars at the stock chutes: "Q. Now, the Frisco exchange track—*then you were going to* come back and do some other work were you, or *deliver the Frisco car to the Frisco track?* A. Yes, sir; deliver this car to the Frisco.*"

On the second day of the trial plaintiff was recalled to the stand and gave the testimony which is now stressed as making a submissible case under the Federal law. It follows: "Q. Now, tell the jury what was your next switching movement, or your movement after you were coupled onto the Frisco box car? A. We were going to shove down the main line south to the stock chutes, and, on the way down, we kicked another car of flour and an empty New York Central box car in on the house track and proceed down to the south end of the stock track and shove those three empty stable cars in on the chute. Q. When you say kick them in on the train? A. Put them in on the train so they would be ready when we got ready to go. Q. Was that the car of flour you referred to yesterday as being behind the engine? A. Yes, sir. Q. And where was that flour going? A. That flour was billed to Fort Worth, Texas."

■ Plaintiff had previously testified he was rendered unconscious by his fall to the platform (October 9, 1933) and did not know anything until November 3, 1933. This variance in plaintiff's testimony stands unexplained of record; and we consider his testimony purporting to cover the switching movements on October 9, 1933, subsequent to his injury devoid of probative value. On the first day of the trial plaintiff testified he did not have testimonial knowledge of facts subsequent to his fall. The situation calls for the application of Steele v. Kansas City S. Ry. Co., 265 Mo. 97, 115, 175 S. W. 177, 181(2), to the effect that, present only that inference deducible from a desire to obtain a verdict and absent any reasonable excuse or explanation, "what you said to-day, since it contradicts what you said on yesterday, also cancels it, and you have, at the best that may be

said, no proof upon a point vital to your case." And while we deem it not important, if the testimony is to be construed as to what plaintiff *thought* the movements would be, they were in charge of Mr. Bohon, then such testimony also stands contradicted by his previous testimony and the Steele case is likewise applicable, as it is also applicable to his testimony concerning the sequence of the cars behind the engine. [Consult Southern Ry. Co. v. Walters, 284 U. S. 190, 194, 52 Sup. Ct. 58, 59(1), 76 L. Ed. 239, 242; Adelsberger v. Sheehy, 332 Mo. 954, 961 (5, 6), 59 S. W. (2d) 644, 647(6-8).]

The other testimony bearing on the issue (we omit details) was that of the five cars coupled behind the locomotive, the first two cars were the empty box cars secured from the rip and team tracks, and the three end cars were the stock cars secured from the house track; that the movement in progress *and the movements subsequently actually executed*, the latter standing unquestioned by any evidence, were the coupling with the Frisco car; then the spotting of the three stock cars at the stock chutes south of the station, then the placing of the Frisco car on the Frisco interchange track north of the station, then the delivering of the two empty box cars to the Larabee Mill, which with the eight cars on the mill switch made the ten cars desired by the Larabee Mill, and, thereafter, the picking up of the outbound cars.

Notwithstanding any failure to establish the movement of the interstate car of flour from the Larabee Mill, let us assume it and the New York Central box car formed a part of the cut of cars. The case involves a railroad employee who had occasion to frequently pass from service in one class of commerce to another in the performance of his daily duties.

The applicable provision of the Federal law reads: "Every common carrier by railroad while engaging in commerce between any of the several states . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce. . . ." [45 U. S. C. A., p. 96, sec. 51.] Construing its scope, the United States Supreme Court in Illinois C. Railroad Co. v. Behrens, 233 U. S. 473, 478, 34 Sup. Ct. 646, 647, 648, 58 L. Ed. 1051, 1055, while entertaining no doubt of the power of Congress under the Constitution to regulate the liability of interstate carriers for injuries suffered by members of switching crews in the course of such carriers' general work whether the particular service at the time of the injury, isolatedly considered, be interstate or intrastate, held: ". . . It is clear that Congress intended to confine its action to injuries occurring when the particular service in which the employee is engaged is a part of interstate commerce." The true test of employment in interstate commerce under the act is: "Was the employee, at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part

of it?" [Shanks v. Delaware, L. & W. Railroad Co. (1916), 239 U. S. 556, 558, 36 Sup. Ct. 188, 189, 60 L. Ed. 436, 438, L. R. A. 1916C, 797, 799. Chicago & N. W. Ry. Co. v. Bolle (1931), 284 U. S. 74, 78, 52 Sup. Ct. 59, 61, 76 L. Ed. 173, 176; New York, N. H. & H. Railroad Co. v. Bezue (1932), 284 U. S. 415, 420, 52 Sup. Ct. 205, 207(1), 76 L. Ed. 370, 374, 77 A. L. R. 1370, 1373; Chicago & E. Ill. Railroad Co. v. Industrial Commission (1932), 284 U. S. 296, 298, 52 Sup. Ct. 151, 76 L. Ed. 304, 306, 77 A. L. R. 1367, 1369 (following the Shanks and Bolle cases and definitely overruling two conflicting earlier decisions).] The Bolle case states, concerning the use of the word "transportation" in lieu of the word "commerce" in the above quotation from the Shanks case: "The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation, or in work so closely related to such transportation as to be practically a part of it." It is the nature of the work being done at the time of the injury that determines the issue. "The difference is marked between a mere expectation that the act done would be followed by other work of a different character, . . . and doing the act for the purpose of furthering the latter work." [Louisville & N. Railroad Co. v. Parker, 242 U. S. 13, 14, 37 Sup. Ct. 4, 5, 61 L. Ed. 119, 120 (in considering the moving of an empty car for the purpose of reaching and moving an interstate car to be interstate business). Consult Milburn v. Chicago, M., St. P. & P. Railroad Co., 331 Mo. 1171, 1187(5), 56 S. W. (2d) 80, 86(6); Howard v. Mobile & O. Railroad Co., 335 Mo. 295, 302, 73 S. W. (2d) 272, 275; and Erie Railroad Co. v. Welsh, 242 U. S. 303, 306, 37 Sup. Ct. 116, 118, 61 L. Ed. 319, 324 (for an injury occurring after the execution of an order involving, among others, an interstate car).]

In Pope v. Utah-Idaho C. Railroad Co. (C. C. A. 10th), 54 Fed. (2d) 575(2), defendant was an interstate railroad having sidings Nos. 1, 2, and 3 north of Ogden, Utah, approximately 2, 3, and 3½ miles respectively. The crew had orders to place an empty intrastate refrigerator car on siding No. 2, and an intrastate car of coal on siding No. 3, and pick up seven cars on siding No. 1, loaded for interstate shipment, and place them in position for destination. The crew proceeded northerly, passed siding No. 1 to siding No. 2, and while placing the refrigerator car on that siding plaintiff was injured; after which the crew, without the assistance of plaintiff, completed

1138

the switching orders. In holding plaintiff and defendant were not engaged in interstate commerce at the time of the injury, the court said: "The plain language of the section makes the carrier liable to the employee only upon his 'suffering injury while he is employed by such carrier in such [interstate] commerce.' " Illinois Central Railroad Co. v. Perry (1916), 242 U. S. 292, 294, 37 Sup. Ct. 122, 123, 61 L. Ed. 309, 311, reached the same result in respect to a train making an intrastate trip and which transported interstate freight on the trip out but only intrastate traffic on the return trip, stating: ". . . the trips out and back were distinct, in opposite directions, with different trains" (the engine, caboose and crew being the same); and that any subordination of the return trip to the trip out was independent of the character of the commerce engaged in. Grigsby v. Southern Ry. Co. (C. C. A. 6th), 3 Fed. (2d) 988, 990(2), certiorari denied 268 U. S. 704, 45 Sup. Ct. 638, 66 L. Ed. 1166, follows the Perry case and distinguishes Pennsylvania Railroad Co. v. Morrison (C. C. A. 6th), 3 Fed. (2d) 986, and Baltimore & O. Railroad Co. v. Darling (C. C. A. 6th), 3 Fed. (2d) 987 (1, 2), cases cited by plaintiff; the author of the three cases stating in the Grigsby case, speaking of the other two: ". . . We have held that a switch movement of intrastate cars, made for the very purpose of connecting with interstate cars and thereafter forming an interstate train, is a movement in interstate commerce; but in those cases the connection was direct and immediate."

In Mayor v. Central Vt. Ry. Co. (C. C. A. 2nd), 26 Fed. (2d) 905, 907, the crew of an interstate train was directed to switch a local car from one siding to another. The locomotive was detached from the train and while on the main track, by means of a stake, moved the car on the siding toward the main track. When the car was partly through the switch, plaintiff was injured. Thereafter, the car was coupled to the nose of the locomotive, which was again coupled to the train and the train moved to a siding to permit the passage of another interstate train. Afterwards the train moved forward about a mile and, placing the car on the local siding, continued on its interstate journey. Held, plaintiff's service in interstate commerce was interrupted and his injury did not occur while he was engaged in interstate commerce. McNatt v. Wabash Ry. Co., 335 Mo. 999, 1003, 1007, 1009, 74 S. W. (2d) 625, 626, 629, 630(6), is to like effect. The facts differed materially upon the second submission of the McNatt case [341 Mo. 516, 108 S. W. (2d) 33, 36(3, 4)].

Plaintiff's authorities may be classified as follows: The movement of an intrastate car to take it out of [New York C. & H. R. Railroad Co. v. Carr, 238 U. S. 260, 264, 35 Sup. Ct. 780, 781, 59 L. Ed. 1298, 1300 (holding such an act to be "so directly and immediately connected with such [interstate] business as substantially to form a part or a necessary incident thereof"); Rogers v. Mobile & O. Rail-

road Co., 337 Mo. 140, 146(2), 85 S. W. (2d) 581, 584(4, 5)] or to place it in [Pennsylvania Railroad Co. v. Morrison (C. C. A. 6th), 3 Fed. (2d) 986; Baltimore & O. Railroad Co. v. Darling (C. C. A. 6th), 3 Fed. (2d) 987] an interstate train, or the necessary incidental or preliminary switching of an intrastate car to effect the switching of an interstate car [Pennsylvania Co. v. Donat, 239 U. S. 50, 36 Sup. Ct. 4, 60 L. Ed. 139; Louisville & N. Railroad Co. v. Parker, 242 U. S. 13, 37 Sup. Ct. 4, 61 L. Ed. 119; Sullivan v. Wabash Ry. Co. (C. C. A. 6th), 23 Fed. (2d) 323; Reap v. Hines (C. C. A. 2nd), 273 Fed. 88, 90(1)] is so closely related to interstate transportation as to be practically a part of it. Southern Ry. Co. v. Jacobs (1914), 116 Va. 189, 191, 81 S. E. 99, 100(1), affirmed 241 U. S. 229, 36 Sup. Ct. 588, 60 L. Ed. 970, ruled the issue upon Pedersen v. Delaware, L. & W. Railroad Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, in holding the fireman of an interstate train, engaged in shifting intrastate cars, to be within the act because the object of the movement was the making up of an interstate train. Under the facts disclosed no conflict exists; but the use of the word "commerce" in the test of the scope of the act laid down in the Pedersen case is subject to the quotation from Chicago & N. W. Ry. Co. v. Bolle, supra, and see Aldridge v. Wabash Ry. Co., 335 Mo. 588, 595, 73 S. W. (2d) 401, 404. Youngstown & O. Railroad Co. v. Halverstodt (C. C. A. 6th), 12 Fed. (2d) 995, 997(3), involved the switching of cars from an interstate train on an intrastate journey. While the case involved other facts, the switching movement was considered a part of the handling of the interstate train, and the Behrens case, supra, and others were distinguished by the statement they are "inapplicable to a member of a crew of an interstate train, who, in handling it, cuts out of the train some intrastate cars, and in so doing is injured." The case is commented on in Wise v. Lehigh Valley Railroad Co. )C. C. A. 2nd.), 43 Fed. (2d) 692, 694; Jarvis v. Chicago, B. & Q. Railroad Co., 327 Mo. 428, 439, 37 S. W. (2d) 602, 607, and Rogers v. Mobile & O. Railroad Co., 337 Mo. 140, 149, 85 S. W. (2d) 581, 586.

Our rulings recognize the distinctions. See, for instance: Phillips v. Union T. Ry. Co., 328 Mo. 240, 245, 40 S. W. (2d) 1046, 1047(2) (certiorari denied, 284 U. S. 660, 52 Sup. Ct. 36, 76 L. Ed. 559), (holding an employee who, after the completion of a movement of interstate cars, was injured while unblocking a highway railroad grade intersection which had been left blocked by intrastate cars, thereby hastening the movement of the interstate cars, was not within the act), and Howard v. Mobile & O. Railroad Co., 335 Mo. 295, 303, 73 S. W. (2d) 272, 275(3) (holding an employee, whose switching of interstate cars was interrupted for the inspection of said cars and who, during the inspection, switched intrastate cars and was injured after

the crew started the return movement to the interstate cars to resume their switching, made a submissible case under the act).

■ Applying the test quoted from the Shanks case, supra, Birmingham B. T. Railroad Co. v. Dunlap (C. C. A. 5th), 58 Fed. (2d) 951, 952(2), states: "At the time of plaintiff's injury the switch engine was on its way to get a car and put it in interstate transportation. It is immaterial that the switch engine, while making this movement, had attached to it a car that was to move in intrastate commerce. *The situation is not different than it would have been if the switch engine had been proceeding without any car attached to it to get the interstate car.*" (Italics ours.)

In the instant case, under that evidence having substantial probative value, at the time plaintiff sustained his injuries, the movement south to make the coupling with the Frisco car at the depot and, thence, about a quarter of a mile to the stock chutes to place the empty stock cars was separate and distinct, in the opposite direction and to effect a purpose different from the subsequent movement of about a mile north of the depot to place the Frisco car on the interchange track, perform such switching movements as were called for by the switch list at the Larabee Mill or the return therefrom and subsequent placing of cars in the train for transportation. On the movement south the intrastate movement was the dominant movement did not facilitate but rather tended to impede, at least interrupt, and was not interdependent upon the subsequent northerly movement. The presence of interstate cars in the movement south was merely incidental to the intrastate movement.

Plaintiff also says that since the purpose of the movement of the Frisco car was its removal from defendant's main track, used in interstate and intrastate commerce, the issue was for the jury; citing Stewart v. Wabash Ry. Co. (1921), 105 Neb. 812, 818, 182 N. W. 496, 498(3), certiorari denied 257 U. S. 641, 42 Sup. Ct. 52, 66 L. Ed. 412; Seaboard Air Line Ry. v. Koennecke (1915), 239 U. S. 352, 355, 36 Sup. Ct. 126, 127, 60 L. Ed. 324, 327, 101 S. C. 86, 85 S. E. 374. In the Stewart case, so far as disclosed, the purpose of the movement and the signal acted upon was "to clear the main line." In the Koennecke case, "The deceased was engaged in distributing the cars from an interstate train and clearing the track for another interstate train;" and there was testimony sustaining a finding that he "was killed by a train that had just come in and was backing into the yard, that the movement was not a yard movement. . . ." In the instant case it is not contended, as in some cases, that the removal of the Frisco car from the main track and completion of its movement was occasioned by any necessity to clear the main track for interstate commerce. It was in transit from one switch or industry track to another within the local yards. Leaving it on the main track merely to facilitate the intracity yard movement, initiated

but not terminated, to effect a change of its position with respect to the locomotive does not establish any relation between its removal from the main track with interstate commerce within the Federal Act. In Rice v. Baltimore & O. Railroad Co. (C. C. A. 6th, 1930), 42 Fed. (2d) 387, 389(3), 390(8), plaintiff, a member of a switching crew engaged in collecting empty cars, was injured while moving a cut of cars to clear the main track for an interstate train. The court recognized the movement was instantly related to interstate commerce; but stated: ". . . That such use of a main track is but an unimportant and casual incident of a switching operation, having no general relation to interstate commerce. Such a fleeting interruption of an intrastate switching operation . . . is so incidentally and remotely in the interest of interstate commerce as not to bring into application the act." In Wise v. Lehigh Valley Railroad Co. (C. C. A. 2nd), 43 Fed. (2d) 692, 693, we find: "Certainly the mere presence of an intrastate car on an interstate track does not make it a part of interstate commerce." [Consult Mayor v. Central Vt. Ry. Co. (C. C. A. 2nd), 26 Fed. (2d) 905, 907.]

The authorities dispose of the issue adversely to plaintiff's contentions; and he may not maintain an action under Section 51 of said Federal Employers' Liability Act. The verdict was for the right party. The order of the trial court granting plaintiff a new trial is reversed and the cause is remanded with directions to reinstate the verdict of the jury and enter judgment for defendant. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.